191245 J. Furtado v. Amy and Paige Oberg et al. Good morning, your honors. May it please the court, Thomas Noel, representing the appellant in this matter. And with permission, I would reserve two minutes for rebuttal. Thank you. The assembly judgment, of course, is a drastic remedy. It must also be said sometime it's misapplied. Here the court acquiesced in the defendant's position in effect blaming the less culpable, less knowledgeable party in a relationship. In the process, it overlooks unacceptable conduct by the defendant attorneys at issue. The summary judgment decision is based on a number of inferences which we have outlined in our appellant's brief, which really were taken in favor of the moving party rather than in favor of my client's interests. Those are fully outlined in the brief. Basically, there are structural problems here. There are three causes of action alleged in the complaint. The first is attorney malpractice. Second is separate and apart breach of fiduciary duties. Third is misrepresentation. The court's decision is based entirely on the erroneously narrow analysis. Quoting here, Furtado's claims are all dependent on there being an attorney-client relationship between Furtado and the attorney. That's not the case. The other causes of actions were skipped over in effect based on the court's narrow analysis. Okay. Let's take that proposition. How is there a malpractice action if there was no attorney-client relationship? We're not contending that if there was no relationship. I'm trying to find out what you are contending. That the court was erroneous in finding that there was no implied relationship based on the evidence that was submitted. That's a different proposition than the proposition that underlying all of your claims except possibly misrepresentation is a question of the existence of the attorney-client privilege. Do you concede that at least as to the fiduciary duty and the malpractice claims that that proposition is correct? No, Your Honor. We do not. Breach of fiduciary duties, of course, can arise in any number of... Okay. What are the other sources of a breach of fiduciary duty that could have been involved here other than attorney-client? There are no disputes. There was no dispute as to the fact that three individuals went to the attorneys here. No, no. Could you answer my question? What are the other theories other than the existence of an attorney-client relationship which would have given rise to a fiduciary duty? That the appellant here went to these attorneys along with the others to... Answer in terms of your legal theory. I understand you are contesting whether there was an attorney-client relationship. I'm asking you separate questions, and then we'll go back to the basis for your contesting the conclusion that there was no attorney-client relationship. Yes, Your Honor. As is evident from our papers, there is a attorney-client relationship established with these attorneys in September of 2008, which was two weeks after the self-imposed and extended deadline. That matter, the Farina matter, we refer to it. There's no dispute that there was an attorney-client relationship. An attorney clearly owes a client fiduciary duties of honesty, integrity, openness, and disclosure. How does that relationship create a relationship in this corporate matter? It doesn't create an attorney-client relationship in the LLC matter, Your Honor. But our contention is that the facts here, which the inferences taken in my client's favor, show that the agreement was signed by the deadline of September 3, 2008. In fact, the print date on that document indicates September 23, and there were no communications whatsoever prior to that time between the attorneys and Ms. Dreyer, the other business partner in this, concerning an amended agreement. Therefore, we suggest the facts and the inference taken in our client's favor clearly indicates that there is an attorney-client relationship with my client, while this other maneuvering is going on concerning the LLC. I'm sorry, I'm not following you. Should I continue? That my client had an attorney-client relationship with these defendants, rather than the other business partner? On the LLC matter? No, on the Farina matter. Okay. And I just said, one can reasonably think that the fact that there was on a separate matter an attorney-client relationship does not establish that there was one on the LLC matter. I have asked you what other evidence you have. And I'm trying to respond that the fact that there was an attorney-client relationship established on another matter, the attorney still owes duties of candor and honesty to the client, so that if the facts... Beyond the matter in which there is a representation? Yes. Okay. Yes, that is what we contend you on, and I'm sorry if I didn't get to that specific point Aren't you down a side street here? I thought your basic argument, as I read your brief, your first argument was that if three people walk into an attorney's office and say, please set up an LLC for the three of us, and the attorney does that, the attorney, they reasonably believe the attorney, or at least the jury could find, they reasonably believe the attorney is representing each one of them, unless the attorney makes some disclosure and tells them they're not. Correct, Your Honor, and that is our main argument. If we assume that was correct, though, there's an alternative argument raised in the defendant's brief, which is there's no evidence that the breach of that duty, we assume was a duty, caused, approximately caused any harm. And I didn't see a response to that argument in your reply brief. Do you have a... What's your response to that argument? Yes, I believe we briefed that in the principal brief, if not, it's certainly in the summary judgment papers. The response is that my client, when they formed this gym, gymnasium, agreed to manage it without compensation. The only evidence I saw there was an interrogatory answer by your client in response to damage questions, and that was, there's nothing else, there's no, on the summary judgment record, as I understand, that's the only evidence of damages is that interrogatory answer. The interrogatory answer, and there was deposition testimony, the fact that he remained working at the gym, basically managing the operation without compensation, that's the reliance, that he understood he was an owner for a period of several years, that the other owner, Ms. Dreyer, allowed him to think that, and that in effect, because these attorneys did no fair... I could see where that might support it, or if you had evidence that he would have taken some other job that was available to him, but absent both of those, how do you establish harm from the fact that he says, I continued working for them thinking I was an owner? Because he testified, Your Honor, that he would have taken another job. You are correct, there is not evidence that he was offered a piece of paper saying, come work for us, or anything like that. He remained at the gym. And was that in the statement of material facts submitted in connection with the summary judgment? It certainly was, Your Honor, and I should have pointed it out more clearly if we didn't, certainly. That in effect, for four years, if I may just briefly finish up, he remained managing on a daily basis without compensation, except for the one-third of fees he got from his own clients that he trained, where his duties were much broader than that he took care of place. And only four years later, when he asked about what's going on with the ownership and with the health, and tried to contact this attorney, the defendant, he learned she was, he thought, retired, and then the attorney took the other actions that we've outlined in the papers. Thank you. If there are no other questions, I'll... Right, you've reserved some time. Good morning, Your Honors. Jennifer Markowski on behalf of the appellees, Daryl Everett and Attorney Amy Oberg. I'd like to start first with the claims of legal malpractice and breach of fiduciary duty, because I think they all do come down to the primary question as to whether or not there was an attorney-client relationship between Daryl Everett, Ms. Oberg, and Mr. Pollard. And then you best address the question Judge Kayotta posed. Three people walk into an office, say, we want to set up a corporation, whether that's sufficient to have established, at least up until the time period where there's a failure by the plaintiff to sign the corporate, amended corporate papers. Then the issue the district court refused to reach. Your Honor, it is not sufficient to establish an attorney-client relationship, and the district court did go through... That puzzles me, because I didn't make that up. I think that is an example used in virtually every ethics course. I've never heard of, in these days, a lawyer practicing, thinking that three people could walk into the lawyer's office to set up a corporation or set up anything else, and the lawyer then sets it up for all of them and doesn't affirmatively disclose that it's not representing one of them individually. I thought that was a slam dunk, that the person could reasonably think the lawyer's representing them. Your Honor, in order for the attorney to be representing the individual, the individual themselves, individually, there has to be a reasonable expectation on the part of each of those parties that that's, in fact, what's happening. Sure, well, three people walk into a lawyer's office and say, do this for us, and the lawyer says, sure, I'll do it for you, and she does it for them. You're saying the jury couldn't find that's a reasonable basis for each of them to think, boy, I thought that was my lawyer. If it's not my lawyer, whose was it? Which one of us? And as the district court found in this particular instance, they came together. It was Karen Dreyer who brought them to this particular attorney who had been her attorney for many years. So they should have guessed that she was representing just Dreyer? Not that they should have guessed. There needs to be more beyond, if you look at the entire context and the entire history of what occurred and the back and forth and who was paying the bills, who was communicating with whom, there's no evidence that Mr. Portado ever communicated alone with Attorney Oberg. All of the communications were done, if at all, with a group together. So who was she representing? So, initially, she was representing Ms. Dreyer. But when she formed the LLC, who was she representing? Ms. Dreyer. Only? Correct. Did she ever say that to the other two? There's no evidence in the record. So how were they to know she was representing, it sounds like, what, Monty Hall took three doors. Which one? I think even the bigger point beyond, and this issue was addressed as to whether or not, what obligations and what duties arise when an attorney undertakes to represent an LLC. So even assuming for purposes of the corporate setup that the attorney was representing everybody. The bottom line is that in this particular case, there was absolutely nothing that Attorney Oberg did or failed to do that breached any duty that could have potentially arguably been owed to Mr. Vurtado. Okay, you have two arguments. There was no evidence of any breach, and then Judge Kayada earlier suggested another line of reasoning. There's no harm. Correct. Okay. Correct, Your Honor. And doesn't your opponent say, well, I never received the document which told me I had to sign by a particular date in order to preserve my interest in the corporation? He does say that, but what he does not admit to or recognize is his own deposition testimony in which he says he quite clearly sat down with Attorney Oberg, as she sat with all of them, and went through the agreement and said, these are the provisions. This is what the agreement provides for, and each of you must execute an amended operating agreement by the deadline. And failure to do so will mean that you will cease to be a member. She told them that. Mr. Vurtado admitted to that. He conceded that he understood that. He understood that he knew that he had to execute the amended operating agreement by September 3rd, 2008, or he would cease to be a member. I would add to that that Attorney Oberg communicated directly with Karen Dreyer. It is not the attorney's obligation to communicate with all of the members, and she previously communicated with Attorney, excuse me, with Ms. Dreyer, and in order to get the extension... So you think you could represent three people, just pick one of them that you're going to communicate with and not tell things to the other two, unless you've already agreed with them that that's the way you would handle communications with them? To the point of if she was representing the LLC, which goes to Mr. Vurtado's point that says if she was representing the LLC, she owed duties to me. But historically, she had communicated with Ms. Dreyer, and this is perfectly acceptable for, and she did this, circulated to the others, the extension, they all signed off on it. What's critical is that Mr. Vurtado knew, understood, and agreed that he had to sign off by September 3rd. I'm guessing that if three people walk into your firm and say, could you represent this in this matter, that your firm requires that you either turn them down or you get a signed disclosure among all of them regarding the potential conflicts of interest and adverse interest? That is correct. In fact, every firm in Rhode Island does that under the ABA rules. There would be a discussion about that. Except your client in this case. In this particular instance, that was not done. We have no evidence in the record of that having occurred. So obviously there were sloppy practices here, and obviously the court has some concerns about saying that there was no possible attorney-client relationship during this initial period of time. But the district court avoided that issue because the judge thought it was not necessary to reach it. Is it your argument that it is not necessary to reach the issue in order to uphold summary judgment? Yes, Your Honor. Because you have to look at what the sloppy practices are that are in effect. In other words, what here does Mr. Vurtado say went wrong? What was the problem? And what he says is that he failed to sign the amended operating agreement. That's the only issue that I see in this case, that he did not sign off on that. And he has two theories. Originally his theory was she should have done more to make sure that he did that, that he signed off on it. And then his second theory is she should have notified him that Ms. Dreyer had signed the amended operating agreement. There isn't any definitive evidence that she actually knew that Ms. Dreyer signed it. There was a theory that she had it. She signed it and everybody else decided not to sign it, including Mr. Vurtado. But just assuming for purposes that that was the case. But at the end of the day, it made no difference whatsoever because Mr. Vurtado had all of the knowledge available to him to understand, and he recognizes that today, that in order for him to continue to be a member, he needed to sign it. And for whatever reason, he didn't care. He continued on for three and a half years. He didn't ask anybody about the amended operating agreement. He didn't ask about the profits or losses of the companies. He never raised any issues. He didn't ask Attorney Obert. He didn't ask Ms. Dreyer, Mr. Powell, anybody. He was perfectly content to continue on knowing that by failing to sign that document on September 3rd, he was no longer a member. At least arguably, he wasn't. And the only time he raised it is when the issues came up between him and Ms. Dreyer. So his, after the fact, contention now that he would have done something differently is completely unsupported by the record because he knew from September 4th forward that he was not a member of it. He hadn't signed the amended operating agreement. So now, after the fact, it's very convenient for him to come back and say, I would have done something differently. But more importantly, there's no evidence in the record that this business made any money. There were no profits to be had. The only evidence in the record came from Ms. Dreyer, who said the business was not profitable. Mr. Portado put no money whatsoever into this business. And although he says that he didn't draw a salary, he did bring in his personal training clients, and he did take money from those clients. He used this business, the gym as a business, to continue to train his own clients. So it's not as though he gave up a salary for all that time. And during that entire time, he knew he had not signed that agreement, and he knew full well the implications of that. So it's not a situation where she didn't explain to these individuals what their rights were, or what the contract was, or she misrepresented it, or she wasn't, you know, somehow left something out with regard to one. She sat them all down, said, here is what you need to do, and he fully understood it, and he didn't do it. And there's absolutely no evidence that there was any harm that has come from him, the current situation. He could have raised these issues back in September of 2008 or 2009. At any point in time, he could have said, hey, wait a minute, am I a member, am I an owner? He waited until the business started to fall apart. And maybe that was strategic on his part. 2008, 2009, the economy wasn't doing great. Maybe he thought, I'm just going to ride this out. I don't need to, I don't want to sign off on the amended operating agreement. Whatever, we don't know. Whatever the rationale was, he clearly knew what his obligations were because Attorney Obert explained them to him. Thank you. Thank you. Very briefly, thank you again. To reiterate, to counter a couple points, the financial viability of the operation, there's no evidence that it was financially non-viable for four years. The only evidence is that Ms. Dreyer decided to close it when this dispute arose. And in fact, the financial records in the record indicate that Ms. Dreyer took some of the proceeds to pay her own bills. She admitted that at deposition. That's also part of the record. The issue of payment of legal invoices is counter to what was just represented. The only evidence we have is that the LLC paid by electronic transfer the few legal invoices that were produced. You're avoiding the main point, which is your client knew he had to sign certain papers by a particular date. That's what the evidence shows. For whatever reason, he didn't. And the case ends at that point because he has no further claim, if he had any claim at all to any representation, much less ownership interest. Could you address that? Yes, Your Honor. If that is the case, he was a member of the LLC for the brief period in the beginning. And what were the breaches during that period? I apologize? What were the breaches and what was the harm during that very brief period? Failure to provide Mr. Furtado with an amended operating agreement during that period before the deadline. And according to the appellee's own position, they had given it to Karen Dreyer, the other partner. She signed it with an as of. It is in quotes. I'm not making air quotes for sarcasm purposes. It says, as of August 26, 2008. Do you have expert testimony that the standard of care required her to do more than tell him he had to sign by a certain date and make sure he knew that? But then she also had to affirmatively follow up and send him with a document absent communication from her? Yes, Your Honor. And in fact, the expert report is in the appendix. We didn't highlight that in any of the papers because we never got to that point. But yes, the attorneys here... By highlight, you mean you didn't point to it in your Statement of Material Facts? We did not point to it. We did not argue it. Then it's out. I'm sorry? Then why can we consider it if it's not in the Statement of Material Facts? Your Honor, we never got to the point where we were putting on expert opinion. Your Honor asked if we had it. Yes, we do. And it was presented during the litigation prior to summary judgment. The central issue here is whether the central factual determination was an error. That Ms. Dreyer timely signed it. There's absolutely evidence contradicting that. I know you think it's important, but I'm having trouble seeing why that's important. If your client knew there was a deadline, he had been told, he lets the deadline go by, and there's no evidence that she was obligated to do more than tell him. Oberg was not obligated to do more than tell him about the deadline. Because if it was signed during the period, clearly the attorney should have also given it to the other participants. If it was signed after the deadline... Why? I'm sorry? Why? Your Honor, based on the duties owed to my client, fiduciary duties, I've been outside of an implied attorney-client relationship. I see. It was a position of trust and confidence. And your claim is if her signature on the document had been given to your client, your client would then have signed the agreement? Is that the idea? Yes. Does he say that? Does he say that? He was not asked that, and he has not stated that. But your Honor, thank you, your Honor. Thank you. Thank you both. We urge the case be remanded. Thank you.